**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| CHAMPION RETAILCO, LLC, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MOTION FOR PRELIMINARY** |
| | ) | **INJUNCTION** |
| CHARLES PRICE III, | ) | |
| | ) | *EVIDENTIARY HEARING REQUESTED* |
| Defendant. | ) | |

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Champion Retailco, LLC ("Champion") moves this Court to issue a preliminary injunction against Defendant Charles Price III ("Price") to prevent further immediate irreparable harm until a trial on the merits can be heard.

As set forth in Champion's Verified Complaint for Monetary and Injunctive Relief ("Complaint"), Champion designs, builds, and installs windows, doors, and sunrooms and also installs roofing and siding on residential homes.  Price executed an employment agreement containing certain restrictive covenants after Champion hired him as a District Sales Manager in Alabama and received training on and access to Champion's trade secrets to grow the business in northern and central Alabama.  Since resigning his employment with Champion, however, Price has blatantly breached his restrictive covenants by (1) becoming employed or otherwise engaged by EcoView Windows & Doors of North Alabama ("EcoView"), a direct competitor of Champion in Alabama, to manage and selling windows and doors on behalf of EcoView; (2) directly and indirectly soliciting at least five Champion employees to either work for EcoView or provide information on other Champion employees whom Price wanted to hire at EcoView; and (3) using and disclosing Champion's trade secrets to further EcoView's business and solicit

Champion's employees.  Despite the fact that Champion has demanded Price cease his contractual breaches and trade secret misappropriation, Price's wrongful activities continue unabated, causing Champion to suffer immediate irreparable harm including the loss of its trade secrets, good will, competitive advantage, and relationships with its customers, employees, and suppliers.

Furthermore, Price will inevitably continue to use and disclose Champion's trade secrets at EcoView to compete with Champion in northern and central Alabama.  This threat of inevitable disclosure alone warrants immediate injunctive under Ohio law.  When coupled with clear and convincing evidence of Price's breach and continued breach of his non-disclosure, non-competition, and non-solicitation restrictive covenants, there can be no question that injunctive relief is necessary here.

Specifically, Champion requests that this Court issue a preliminarily injunction which enforces the contractual promises made by Price and enjoins him from, directly or indirectly:

- using or disclosing Champion's confidential information, including its trade secrets;

- participating or engaging in, as an owner, partner, shareholder, employee, officer, director, independent contractor, consultant, advisor, or rendering services to an entity which is competitive with the business conducted by Champion;

- diverting, soliciting, interfering with, or entering into a contract with Champion's customers from which Champion generated business during the twenty-four (24) months immediately preceding Price's separation from employment or from any prospective customers of Champion known to Price during the twenty-four (24) months immediately preceding his separation from employment; and

- employing or soliciting for employment any Champion employees to compete with Champion or inducing any Champion employee to terminate the employee's relationship with Champion.

If Price is not so enjoined, Champion will suffer irreparable harm.

This motion is supported by Champion's Complaint, with its supporting exhibits, and the accompanying Memorandum in Support, both of which are incorporated herein by reference. A proposed Order is attached.

Respectfully submitted,

*s/ Joseph N. Gross*
Joseph N. Gross, Trial Attorney
Bar Number 0056241
Richard E. Hepp
Bar Number 0090448
Alexandria A. Gardella
Bar Number 0100000
**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
200 Public Square, Suite 2300
Cleveland, Ohio 44114-2378
Telephone: 216.363.4500
Facsimile: 216.363.4588
Email: jgross@beneschlaw.com
rhepp@beneschlaw.com
agardella@beneschlaw.com

*Attorneys for Plaintiff Champion Retailco, LLC*

## CERTIFICATE OF SERVICE

A copy of the foregoing *Plaintiff's Motion for Preliminary Injunction* and accompanying *Memorandum in Support* and *Proposed Preliminary Injunction Order* are being served upon the following with the Summons and Complaint:

Charles Price III
2526 Millwood Circle Southeast
Huntsville, AL 35803

*Defendant*

*s/ Joseph N. Gross*
Joseph N. Gross, Trial Attorney
Bar Number 0056241
*One of the Attorneys for Plaintiff*
*Champion Retailco, LLC*

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| CHAMPION RETAILCO, LLC, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM IN SUPPORT** |
| | ) | **OF MOTION FOR PRELIMINARY** |
| CHARLES PRICE III, | ) | **INJUNCTION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.    INTRODUCTION

Plaintiff Champion Retailco, LLC ("Champion") is a leading provider of windows, doors, and sunrooms in the residential home market.  It markets, sells, and installs the products it designs and builds in twenty-nine (29) states, including Alabama, using confidential sales information and procedures that Champion has developed and refined since it was founded in 1953.  Champion protects its sales information and procedures as well as other trade secret information by, among other things, requiring employees with access to them to execute non-disclosure, non-competition, and non-solicitation restrictive covenants.

As a District Sales Manager employed by Champion, Defendant Charles Price III ("Price") was required to recruit, hire, train, and manage sales representatives to drive sales and grow business profits for Champion in northern and central Alabama.  So that Price could perform his duties, Champion provided him specialized training in the design, use, and operation of its products and services; access to its goodwill, business relationships, and contacts with third parties; and access to Champion's business, marketing, and sales strategies, methods of operations, compensation plans, and future business plans.

Since resigning from Champion, Price has used Champion's trade secrets to instead build up EcoView Windows & Doors of North Alabama ("EcoView")—a direct competitor in

Huntsville, Alabama that markets, sells, and installs windows and doors that directly compete with the Champion's products and services. For example, Price appeared at a potential customer's home at the same time a Champion sales representative was pitching the customer and the customer ultimately decided to purchase from the competitor. He also used Champion's trade secrets to solicit at least five Champion employees to either work for EcoView or to provide information to him about other Champion employees whom he wanted to hire at EcoView.

Price's wrongful activities violate not only the federal Defend Trade Secrets Act and Ohio's Uniform Trade Secret Act but also the non-disclosure, non-competition, and non-solicitation restrictive covenants in his Executive Employment Agreement (his "Agreement"). Moreover, because Price is operating in a role similar to his former position at Champion, he will inevitably use and disclose and, on behalf of himself and EcoView, Champion's trade secrets, creating a demonstrable threat of irreparable harm that likewise warrants injunctive relief.

Accordingly, for the reasons set forth below and in Champion's Verified Complaint for Monetary and Injunctive Relief ("Verified Complaint"), a preliminary injunction enjoining Price from breaching his contractual promises and misappropriating Champion's trade secrets is necessary to protect Champion from further immediate and irreparable harm to its legitimate business interests, including the loss of its trade secrets, good will, competitive advantage, and relationships with its customers, suppliers, and employees.

## II. FACTS

### A. About Champion.

Champion was established in 1953 in Cincinnati, Ohio. Champion designs, builds, and installs windows, doors, and sunrooms and also installs roofing and siding on residential homes (the "Champion Services"). Champion maintains operations in twenty-nine (29) states, including Alabama. (Complaint, ¶ 8.)

Champion employs District Sales Managers to recruit, hire, train, and manage sales representatives to drive sales and grow business profits for multiple Champion locations. Among other duties, District Sales Managers are responsible for coaching and motivating sales representatives and other sales staff to achieve peak sales performance; maintaining knowledge of and identifying trends in the in-home sales industry; developing local advertising and marketing efforts to generate sales opportunities; creating positive relationships with customers and employees; and maintaining operational compliance with corporate policies, practices, procedures, and government regulation. (Complaint, ¶ 9.)

So that District Sales Managers can perform their duties, Champion provides them specialized training regarding the Champion Services and access to Champion's goodwill, business relationships, and contacts with third parties, including without limitation, its customers, potential customers, and employees of those third parties. Champion also provides District Sales Managers with its confidential information and trade secrets related to the design, development, marketing, sales, and operational strategies and processes of the Champion Services including, but not limited to, information relating to its customers (including their contact information and preferences), suppliers, vendors, and employees; advertising and marketing plans; business and financial strategies, plans, budgets, goals, projections, and objectives; research and development activities and initiatives; the strengths and weaknesses of the Champion Services; costs, profit margins, and pricing associated with the Champion Services; sales strategies, including the manner in which it responds to customer requests and requests for information or requests for proposals; and third-party information considered confidential by its customers, vendors, and suppliers and those entities' customers, vendors, and third-party providers (collectively, Champion's "Trade Secrets"). (Complaint, ¶¶ 10-11.)

Champion has devoted extensive time, money, and other resources to develop its Trade Secrets and its Trade Secrets are not generally known outside Champion. Champion takes steps reasonable under the circumstances to keep such information confidential by, among other things, having executive employees with access to the Trade Secrets execute agreements with non-disclosure covenants, advising all employees through policy of the requirements that such information be held confidential, creating password-protected electronically stored information, having independent contractors and other business partners execute non-disclosure agreements or other applicable agreements containing confidentiality protections before sharing such information, and otherwise reasonably controlling access to such information. Given the highly competitive nature of the in-home sales industry, Champion takes such precautions because it would suffer irreparable harm if its Trade Secrets were to be obtained by, or used on behalf of, its competitors or if the goodwill and competitive advantage it had built with its customers using the Trade Secrets were to be used by a competitor. (Complaint, ¶¶ 13-15.)

**B.      Price's Employment with Champion.**

On or about December 21, 2020, Champion hired Price in the position of District Sales Manager at its office in Huntsville, Alabama, which covers northern and central Alabama, from Lincoln County, Tennessee south to Cullman County, Alabama and from the Georgia state line west to the Mississippi state line. (Complaint, ¶ 16.)

Incident to his employment, Price executed his Agreement. The Agreement contains certain non-disclosure, non-competition, and non-solicitation restrictive covenants which Price acknowledges are reasonable in scope, territory, and duration; designed to eliminate unfair competition; do not stifle his inherent skill and experience or prevent him from obtaining gainful employment; are fully required to protect Champion's legitimate business interests; and do not confer a benefit upon Champion disproportionate to his detriment. (Complaint, ¶¶ 17-19; Ex, A.)

In Section 8 of the Agreement, Price acknowledges that the "success of the Company and each of its employees is directly predicated on the protection of its knowledge and information," including the Trade Secrets, and that such information, "is highly valuable and provides a competitive advantage to the Company." In Section 9, Price further agrees to "to retain the Information in absolute confidence and not to use or permit access to or disclose the Information to any person or organization, except as required for the Executive to perform his job with the Company." (Complaint, ¶¶ 20-21; Ex. A.)

Section 10 of the Agreement contains a non-competition restrictive covenant, which provides, in pertinent part:

> **NON-COMPETITION**. Executive recognizes the Company's need to prevent unfair competition and to protect the Company's legitimate business interests. Accordingly, Executive agrees that, during Executive's employment and **for a period of 12 months (each month representing 30 calendar days)** following Executive termination (for any reason), whether voluntary or involuntary, Executive will not accept employment in or engage in any business activity (whether as a principal, partner, joint venturer, agent, employee, salesperson, consultant, independent contractor, volunteer, director, or officer) with a "Competitor" of the Company where such employment or business activity would involve Executive:
>
> (a)     providing, selling or attempting to sell, or assisting in the sale or attempted sale of, or providing or performing management functions, relating to any services or products similar to those services or products with which Executive had any involvement or Information during Executive's employment with the Company (including any products or services being researched or developed by the Company during Executive's employment with the Company); or
>
> (b)     providing or performing services that are similar to any services that Executive provided to or performed for the Company during Executive's employment with the Company.
>
> …
>
> For purposes of this Agreement, a "Competitor" is any business or entity that, at any time during the 12 months period (defined above) following Executive's termination (for any reason), whether voluntary or involuntary, from the Company, provides or seeks to provide products or services that compete with the products or services of the Company, including, without limitation, any company

5

or business that installs windows, doors, sunrooms, roofing, and/or siding. This provision includes those services or products being researched or developed by the Company during Executive's employment.

This restriction will be limited to the geographical area where the Company is doing business, the geographic area where the Company markets its products and/or services at the time of termination of Executive's employment, and the geographic area where the Company had a documented plan in place (on or before Executive's termination date) to commence conducting business in that same geographic area. (Complaint, ¶ 22; Ex. A. Emphasis in original.)

Section 11 of the Agreement contains a customer non-solicitation restrictive covenant,

which provides:

**NON-SOLICITATION OF CURRENT AND PROSPECTIVE CUSTOMERS**. The Company's business relationships with its customers have been developed through significant effort and often over a period of many years and such customers are vital to the Company's success. Therefore, Executive agrees that the Company's communications, relationships, and business dealings with its customers through its employees are not only protected as part of its Information restrictions (see Sections 8 and 9), but also deserves protection in a manner separate from the noncompetition restrictions set forth in Section 10 above. Accordingly, during Executive's employment and **for a period of 24 months (each month representing 30 calendar days)** following Executive's termination (for any reason), whether voluntary or involuntary, from the Company (defined above in Section 8), Executive will not directly or indirectly, through any person or entity, for the purpose or intention of attempting to sell or selling any Competitor's products or services or attempting to divert or diverting business away from the Company, communicate with: (i) any of the Company's customers from which the Company generated revenue during the 24 months preceding Executive's termination; or (ii) any prospective customers known to Executive during the 24 months prior to Executive's termination. Executive also shall not, directly or indirectly, accept any such business from said customer or prospective customer, whether or not solicited by him. (Complaint, ¶ 23; Ex. A. Emphasis in original.)

Section 12 of the Agreement contains an employee non-solicitation restrictive covenant,

which provides:

**NON-SOLICITATION/HIRING OF EMPLOYEES**. Executive will not, directly or indirectly, attempt to or actually induce, persuade, or entice any current or former Company employee, at any time, to violate any of such person's non-compete and/or non-solicitation and/or non-disclosure and/or non-disparagement agreement(s) with the Company (defined above in Section 8). Additionally, Executive will not, directly or indirectly, **for a period of 24 months (each month**

**representing 30 calendar days)** following his termination (for any reason), whether voluntary or involuntary, from the Company: (a) communicate with any current or former Company employee concerning employment opportunities with a Competitor; (b) attempt to or actually induce, persuade, or entice any Company employee to terminate such person's employment relationship with the Company, whether or not such person's new employment would be with a Competitor or; and/or (c) employ or assist in employing a current or former Company employee in any capacity for his own competing business or on behalf of any Competitor. (Complaint, ¶ 24; Ex. A. Emphasis in original.)

Section 16 of the Agreement contains a remedies provision, which provides in pertinent part:

Based upon his executive position and the Information he has received and will receive or have access to, Executive further agrees that any breach of the covenant not to compete and/or non-solicitation covenants described herein would result in the inevitable disclosure of the Company's confidential, proprietary, and trade secret Information. Executive therefore agrees that the Company, in addition to any other rights and remedies available to it, shall be entitled to obtain an immediate injunction, whether temporary, preliminary, or permanent, in the event of any such breach or threatened breach by Executive.

Section 16 of the Agreement further provides that the temporal limitations periods for the restrictive covenants shall be tolled while Price is in breach of the Agreement so that Champion may receive the full benefit of his restrictive covenants. (Complaint, ¶¶ 25-26; Ex. A.)

Finally, Section 22 of the Agreement provides that it shall be governed by and construed in accordance with the laws of the State of Delaware. (Complaint, ¶ 28; Ex. A.)

During Price's employment, Champion provided Price with extensive training in and knowledge of its Trade Secrets related to the design, development, marketing, sales, and operational strategies and processes of the Champion Services. Price used the Trade Secrets to manage the sales staff; develop his knowledge of and identify trends in the in-home sales industry; develop local advertising and marketing efforts to generate sales opportunities; and create positive relationships with Champion's customers and employees. On or about May 9, 2022, Price voluntarily resigned his employment with Champion. (Complaint, ¶¶ 29-30.)

**C.     Price Unfairly Competes with Champion and Misappropriates its Trade Secrets.**

On or about October 2022, Champion learned that Price became employed or otherwise engaged in a sales capacity with EcoView, which markets, sells, and installs windows and doors that directly compete with the Champion Services in Alabama.  Since becoming employed or otherwise engaged by EcoView, Price has sold and attempted to sell, or otherwise assisted in the sale or attempted sale of products offered by EcoView that directly compete with the Champion Services that Price had involvement in and possessed Trade Secrets about during his employment. Price also has performed services on behalf of EcoView that are similar to the job duties Price performed as a District Sales Manager for Champion.  (Complaint, ¶¶ 31-34.)

For example, in October 2022, a Champion sales representative was attempting to sell the Champion Services at a potential customer's home in Albertville, Alabama, when Price arrived unannounced and unscheduled at the customer's home to sell windows on behalf of EcoView. After speaking with the Champion sales representative, Price told the sales representative that he would return to the customer's home the next day to make his pitch.  The prospective customer subsequently informed the Champion sales representative that he had decided to purchase products from a competitor.  In another example, Price sold windows and doors on behalf of EcoView to a consumer in Alabama in direct competition with Champion.  The consumer who purchased the windows and doors later provided a five-star review on EcoView's website describing of Price's unfair competition on behalf of EcoView.  As such, Price has breached the non-competition provision in his Agreement.  (Complaint, ¶¶ 35-37.)

Price also has solicited Champion employees who reported to him to resign their employment with Champion to work for EcoView.  Beginning in December 2022, Price contacted at least five employees on multiple occasions from the Champion's offices in Huntsville and Birmingham, Alabama, including one sales representative from the Huntsville office who

resigned in January 2023 to work for EcoView, a second sales representative from the Huntsville office who resigned in January 2023 but refused to say where he was going to work, a sales representative from the Birmingham office who remains employed with Champion despite Price's solicitation, a measure technician from the Huntsville office who remains employed with Champion, and an installation supervisor from Huntsville with whom Price spoke with about other measure technicians and installers employed by Champion.  (Complaint, ¶¶ 38-39.)

Beginning in 2022 and continuing thereafter, Price has been using and disclosing Champion's Trade Secrets, including its business development plans and strategies, marketing plans and strategies, pricing and margin information, employee information, and the strengths and weaknesses of the Champion Services to EcoView so that he and EcoView could use such Trade Secrets to expand EcoView's business in Alabama.  (Complaint, ¶ 40.)

### D. Champion Demands Price to Cease and Desist from his Unfair Competitive Activities and Trade Secret Misappropriation

On October 14, 2022 and January 6, 2023, Champion sent Price letters via Federal Express demanding that Price resign from his employment with EcoView in breach of the Agreement and cease and desist from otherwise violating the restrictive covenants in his Agreement.  Price did not respond to the October 14-letter or the January 6-letter.  (Complaint, ¶¶ 41-44; Exs. B and C.)

Despite these notices, Price's unfair competitive activities continue.  Price remains employed or otherwise engaged by EcoView in breach of his post-employment obligations to Champion, and given his similar responsibilities to EcoView, Price will inevitably continue using and disclosing Champion's Trade Secrets.  Price's wrongful activities are causing Champion to suffer irreparable harm, including the loss of its Trade Secrets, goodwill, competitive advantage, and its relationships with its customers, suppliers, and employees.  Unless injunctive relief is

entered precluding Price from working for EcoView in competition with Champion, soliciting, interfering with, or entering into contracts with Champion's customers, prospective customers, suppliers, or employees, or disclosing or using Champion's Trade Secrets, Price will inevitably use and disclose Champion's Trade Secrets and unfairly compete with Champion. Damages caused by Price's actions are extremely difficult to ascertain in that it is impossible to determine the full value of the loss of Champion's Trade Secrets, goodwill, competitive advantage, and its relationships with its customers, suppliers, and employees. (Complaint, ¶¶ 45-47.)

## III.  LAW AND ARGUMENT

### A.  Standard for Injunctive Relief

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). A party requesting a preliminary injunction must show (1) a strong likelihood of succeeding on the merits; (2) the party will suffer irreparable injury absent the injunction; (3) the injunction will not cause substantial harm to others; and (4) the public interest will be furthered by the issuance of the injunction. *York Risk Servs. Grp. v. Couture*, 787 Fed. App'x 301, 305 (6th Cir. 2019); *Office Depot, Inc. v. Impact Office Prods., LLC*, No.: 1:09 CV 2791, 2011 U.S. Dist. LEXIS 117733, at * 34 (N.D. Ohio Oct. 12, 2011) ("A district court uses equitable principles of federal law in determining whether to issue a preliminary injunction," not state law) (citing *S. Milk Sales v. Martin*, 924 F.2d 98, 102 (6th Cir. 1990)). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Handel's Enters. v. Schulenburg*, 765 Fed. App'x 117, 121 (6th Cir. 2019) (quoting *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)). Indeed, the factors are intended to "guide the discretion of the court; they are not meant to be rigid and unbending requirements." *Id.*

(quoting *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012)).  Here, the balancing of the four factors supports the issuance of a preliminary injunction to prevent further immediate irreparable harm to Champion.

**B.  Champion Has a Strong Likelihood of Succeeding on the Merits of its Claims**

A party seeking a preliminary injunction must show that it has demonstrated "a strong likelihood of success on the merits."  *York*, 787 Fed. App'x at 305 (*quoting Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)).  Although a party is not required to prove its case in full at a preliminary injunction hearing, a plaintiff "must show more than a mere possibility of success."  *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).  Whether a party is likely to succeed on the merits is an issue of substantive law.  *Certified Restoration*, 511 F.3d at 541.

**1.  Champion Has a Strong Likelihood of Success on Its Breach of Contract Claim against Price.**

**a.  *Price's Agreement is reasonable under Delaware law*.**

Under Delaware law, restrictive covenant agreements are valid and enforceable if they are reasonable in geographic scope and duration, advance a legitimate economic interest of the enforcing party, and a balancing of the equities tips in the moving party's favor.  *Hough Assocs., Inc. v. Hill*, No. 2385-N, 2007 Del. Ch. LEXIS 5, at * 47-48 (Del. Ch. Jan. 17, 2007).  Here, the non-competition and non-solicitation provisions in the Agreement are reasonable in all respects.

Although Champion is only seeking preliminary relief, the Agreement's non-competition covenant only extends for a period of twelve (12) months while the customer and employee non-solicitation covenants cover a period of twenty-four (24) months, each of which is reasonable under the circumstances.  Indeed, Delaware courts have enforced restrictive covenants for longer periods, particularly against high-level executives like Price.  *See, e.g., Tristate Courier &*

*Carriage, Inc. v. Berryman*, No. 20574-NC, 2004 Del. Ch. LEXIS 43, at * 43 (Del. Ch. Apr. 15, 2004) (upholding two-year non-compete agreement); *Weichert Co. of Pennsylvania v. Young,* No. 2223-VCL, 2007 Del. Ch. LEXIS 170, at * 11-12 (Del. Ch. Dec. 7, 2007) ("Covenants of two-years' duration are consistently held to be reasonable.").

The geographic restriction in the Agreement is similarly reasonable because it is narrowly tailored to cover Price's particular work at Champion and his access to its Trade Secrets. More specifically, Price is only prohibited from working for a competitor that that sells or installs windows, doors, sunrooms, roofing, or siding in the geographical area where Champion is currently doing business, where Champion was marketing the Champion Services as of the date he resigned, and where Champion had a documented plan to expand as of Price's resignation. Delaware courts have consistently held that this scope for a non-competition restriction is enforceable, particularly where a business like Champion is nationwide. *Lyons Ins. Agency, Inc. v. Wilson*, No. 2017-0092-SG, 2018 Del. Ch. LEXIS 317, * 14 (Del. Ch. Sept. 28, 2018) (holding non-compete reasonable despite lack of specific geographic limitations and noting, "This is particularly true when an employer's non-compete agreement prohibits an employee from engaging in activity that is 'in competition with' the employer's business, as opposed to prohibiting activity that is 'similar to' that business.").

Finally, the non-competition and non-solicitation provisions do not impose a greater restraint than necessary to protect Champion's Trade Secrets, goodwill, competitive advantage, and relationships with its customers, suppliers, and employees. Under Delaware law, employers may rely on restrictive covenants to protect their legitimate economic interests, including "preserving employer goodwill and protecting an employer's confidential information, including customer lists, pricing, trade secrets and proprietary information." *Sensus USA, Inc. v. Franklin*,

No. 15-742-RGA, 2016 U.S. Dist. LEXIS 50187, at *21 (D. Del. Apr. 14, 2016); *see also Del. Express Shuttle v. Older*, No. 19596, 2002 Del. Ch. LEXIS 124, at *52 (Del. Ch. Oct. 23, 2002) (finding restrictive covenants on "key employee" with proprietary information serve legitimate business interests, even where such information holds little independent value). Here, Price is merely prohibited from (1) using or disclosing Champion's Trade Secrets, (2) working for a competitor of Champion to sell or attempt to sell competitive products or perform management functions similar to those he performed at Champion, and (3) soliciting Champion's current and prospective customers and employees. Nothing prevents Price from working for a company that sells in-home or other services other than those sold by Champion. Thus, the equities favor enforcement of the restrictive covenants in the Agreement because they protect Champion's legitimate economic interests and also prevent Price from taking Champion's employees to unfairly compete against it. *Hough Assocs., Inc.*, 2007 Del. Ch. LEXIS 5, at * 51-52 (covenants protect employer's legitimate economic interest by protecting its investment in former employer and preventing former employer and competitor from "putting together a cadre of other [] employees to work for the rival in competition with [the employer])."

### b. *Price has breached his Agreement with Champion.*

Under Delaware law, the basic elements of a breach of contract claim are (1) the existence of a duty, (2) breach of that duty, and (3) resulting damages to the plaintiff. *United Healthcare Servs. v. Corzine*, No. 2:21-cv-319, 2021 U.S. Dist. LEXIS 47420, at *50 (S.D. Ohio Mar. 15, 2021) (citing *VLIW Tech., LLC v. Hewlett-Packard, Co.*, 840 A.2d 606, 612 (Del. 2003)).

As discussed above, Price executed a valid, enforceable agreement at the commencement of his employment which include non-disclosure, non-competition, and non-solicitation covenants. Champion performed its obligations to Price by employing him, providing him training in the design, use, and operation of the Champion Services, and providing him access to

13

its Trade Secrets.  Price has not followed suit.  Rather, he has breached his obligations under the

Agreement in myriad ways:

- Price is employed or otherwise engaged by EcoView, a direct competitor of Champion that markets, sells, and installs windows and doors in Alabama.

- Price sold and attempted to sell, or otherwise assisted in the sale or attempted sale of products offered by EcoView that directly compete with the Champion Services that Price had involvement in and possessed Trade Secrets about during his employment.

- Price performed services on behalf of EcoView that are similar to the job duties Price performed as a District Sales Manager for Champion.

- Price solicited Champion employees who reported to him to resign their employment with Champion to work for EcoView.  Specifically, beginning in December 2022, Price has contacted at least five employees on multiple occasions from the Champion's offices in Huntsville and Birmingham, Alabama, including one sales representative from the Huntsville office who resigned in January 2023 to work for EcoView, a second sales representative from the Huntsville office who resigned in January 2023 but refused to say where he was going to work, a sales representative from the Birmingham office who remains employed with Champion despite Price's solicitation, an measure technician from the Huntsville office who remains employed with Champion, and an installation supervisor from Huntsville whom Price spoke with about other measure technicians and installers employed by Champion.

- Price used and disclosed to EcoView Champion's Trade Secrets, including its business development plans and strategies, marketing plans and strategies, pricing and margin information, employee information, and the strengths and weaknesses of the Champion Services so that he and EcoView could use such Trade Secrets to expand EcoView's business in Alabama.

These are a clear and unequivocal breaches of the restrictive covenants contained in the

Agreement.  Accordingly, for all these reasons, Champion has a substantial likelihood of success

on the merits of its breach of contract claim.

### 2.    Champion Has a Strong Likelihood of Success on Its Trade Secret Misappropriation Claims against Price.

Champion seeks injunctive relief based on its misappropriation of trade secrets claims

pursuant to the Federal Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1832 *et seq*., and

Ohio's Uniform Trade Secrets Act (the "OUTSA"), Ohio Revised Code § 1333.61.  Because the

definition and requirements under the DTSA and the OUSTA are essentially the same, courts

generally consider these federal and state law claims together.  *Mech. Constr. Managers, LLC v. Paschka,* No. 3:21-cv-302, 2022 U.S. Dist. LEXIS 90045, at *26 (S.D. Ohio May 19, 2022).

              ***a.***     ***Champion's design, development, marketing, sales, and operational strategies and processes are trade secrets.***

The DTSA and OUTSA define "trade secrets" in a similar manner.  According to the DTSA, the term "trade secret" means:

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).  The OUTSA defines a "trade secret" as information that (1) derives independent economic value from not being generally known to other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  R.C. 1333.61(D)(1) and (2).  Both prongs under the DTSA and the OUTSA are satisfied here.

Given the highly competitive nature of the in-home service industry, Champion receives a substantial economic, financial, and business benefit from its Trade Secrets not being publicly available or used by competitors.  Champion also takes steps reasonable under the circumstances to keep its Trade Secrets confidential including, but not limited to, having its District Sales Managers and other executive employees with access to such information execute agreements with non-disclosure covenants, advising all employees through policy of the requirements that such information be held confidential, creating password-protected electronically stored information, having independent contractors and other business partners execute non-disclosure agreements or other applicable agreements containing confidentiality protections before sharing

such information, and otherwise reasonably controlling access to such information. As such, Champion's Trade Secrets are entitled to protection under the DTSA and OUTSA.

> **b.** ***Champion is entitled to a preliminary injunction based on Price's actual and threatened misappropriation of its trade secrets.***

It is well settled that courts have the inherent power to fashion appropriate injunctive relief to protect an employer's trade secrets. Under the DTSA and OUTSA, a court may enjoin both the actual and threatened misappropriation of trade secrets. 18 U.S.C. § 1836(b)(3)(A) (a court may grant an injunction "to prevent any actual or threatened misappropriation"); Ohio Revised Code § 1333.62 ("Actual or threatened misappropriation may be enjoined"). Such protections are available under the OUTSA even if an employee only utilizes his memory of such information. *Al Minor & Assoc., Inc. v. Martin*, 117 Ohio St. 3d 58, syllabus (Ohio 2008). Moreover, the availability of injunctive relief does not depend upon the actual disclosure of confidential or trade secret information. Rather, it is enough that a substantial risk of disclosure or use exists. *Dexxon Digital Storage, Inc. v. Haenszel*, 161 Ohio App. 3d 747, 832 N.E.2d 62, 68 (Ohio Ct. App. 2005) ("threatened misappropriation of a trade secret is sufficient to allow the trial court to enjoin future use"); *AK Steel Corp. v. Miskovich*, No. 1:14-cv-174, 2014 U.S. Dist. LEXIS 197389, at *16 (S.D. Ohio Mar. 3, 2014) (granting injunction based on threatened misappropriation of confidential information concerning sales, service and pricing strategies given the similarity of defendant's positions with former and current employers, and direct contact with former employer's customer).

Here, actual misappropriation has undoubtedly occurred. Beginning in 2022, Price routinely used and disclosed Champion's Trade Secrets to EcoView so that he and EcoView could use such Trade Secrets to expand EcoView's business in Alabama. Price also used Champion's Trade Secrets regarding employee records to solicit at least five employees on

16

multiple occasions from the Champion's offices in Huntsville and Birmingham, Alabama either to work at EcoView or to provide Price information on Champion's measure technicians and installers so Price could recruit them to work at EcoView. These actions constitute misappropriation, and injunctive relief is necessary to prevent any further misappropriation.

Additionally, it is well settled under the OUTSA that a former employee entering into a business relationship with a competitor in a similar capacity makes it likely that the former employee will utilize the former employer's trade secrets, creating a demonstrable threat of disclosure that likewise warrants injunctive relief. *Proctor & Gamble Co. v. Stoneham*, 140 Ohio App. 3d 260 (Ohio Ct. App. 2000) (enjoining the threatened misappropriation of trade secrets on the basis of the inevitable disclosure doctrine). This doctrine has been widely used as a basis for a preliminary injunction by courts across the state. *Dexxon Digital Storage, Inc.* 161 Ohio App. 3d at 755 ("threatened misappropriation of trade secrets may be enjoined" and "the issuance of an injunction does not hinge on [a plaintiff] proving that [a defendant] 'used' the trade secrets"); *PUI Audio, Inc. v. Van Den Broek*, No. 3:21-cv-284, 2021 U.S. Dist. LEXIS 202846, at * 19 (S.D. Ohio Oct. 21, 2021) (granting injunction when "there is (at least) a threat of misappropriation given the circumstances and [former employee's] employment with [competitor].").

In this case, Price has already misappropriated Champion's Trade Secrets. Further, it is undisputed that he is working for a direct competitor of Champion, in a capacity virtually identical to his position as District Sales Manager at Champion. Having already demonstrated a complete disregard for his legal obligation to honor Champion's trade secret rights, it is clear that Price will inevitably continue using and disclosing Champion's Trade Secrets in the course of his current competitive activities with EcoView. Accordingly, for all these reasons, Champion has a substantial likelihood of success on the merits of its misappropriation of trade secrets claims.

**D.      Champion Will Suffer Irreparable Harm If an Injunction Is Not Issued.**

To demonstrate irreparable harm, a plaintiff must show that it "will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Harm is irreparable if it cannot be fully compensated by monetary damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Id.* (citing *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)). Similarly, "the loss of fair competition that results from the breach of a non-competition covenant," *id.* (citing *Overholdt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991)), and the loss of clients as a result of the impermissible use of confidential information qualify as irreparable harm. *Fort Wash. Inv. Advisors, Inc. v. Adkins*, No. 1:19-cv-685, 2019 U.S. Dist. LEXIS 150991 at *10 (S.D. Ohio Sept. 5, 2019). Notably, even the threat of such harm is sufficient. *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1007 (S.D. Ohio 2008) ("Under Ohio law, irreparable harm exists when there is a substantial threat of material harm that cannot be adequately compensated through monetary damages."). As the Sixth Circuit held in *FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013), if a former employee is successful in luring away a customer base to a direct competitor, the former employer "may never be able to recover that lost business, thereby suffering irreparable harm."

Here, Champion has demonstrated that it will suffer irreparable harm that cannot be fully compensated by monetary damages. Price breached the restrictive covenants in his Agreement to unfairly compete with Champion and used and disclosed Champion's Trade Secrets to EcoView to solicit Champion's prospective customers and numerous employees. Furthermore, there is a substantial threat of material harm given that Price is working at EcoView in the same or a similar position that compels his use of Champion's Trade Secrets and his actions have continued

unabated despite Champion's efforts to cease his unlawful activities.  Unless preliminary injunctive relief is entered, Champion may never be able to recover the loss of its Trade Secrets, goodwill, competitive advantage, and relationships with its customers, suppliers, and employees, thereby suffering irreparable harm.

###    E.    Champion's Injury Outweighs Any Potential Injury Defendants May Suffer as a Consequence to the Granting of this Motion.

When deciding whether to issue a preliminary injunction, courts must balance the irreparable harm a plaintiff may suffer if the injunctive relief is not granted against harm to others should the preliminary injunction being issued.  *Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).  Here, the preliminary injunction order Champion seeks will not cause any harm to Price.  Indeed, the relief sought only requires Price to live up to the very agreement that he entered into with Champion and to cease use and disclosure of Champion's Trade Secrets.  In fact, Price agreed in Section 16 of his Agreement that injunctive relief is an appropriate remedy to enforce the restrictive covenants.  Price would remain free to work for a company that sells in-home products or services other than those sold by Champion.

By contrast, without injunctive relief, Champion's injuries would be extensive and incalculable.  Price would be free to disregard his contractual obligations to Champion and continue to misappropriate the Trade Secrets to directly compete with Champion.  Moreover, the good will and competitive advantage Champion enjoys because of its Trade Secrets would be forever lost.  Thus, the resulting injury to Champion in the absence of injunctive relief far outweighs any injury which may be suffered by Price if the injunction is issued.

###    F.    The Public Interest Would Be Served by Issuance of the Injunction

Preserving the sanctity of contractual relations and preventing unfair competition are traditionally recognized as being in the public interest.  *Prosonic Corp.*, 539 F. Supp. 2d at 1008

(noting that "the Supreme Court has firmly established a constitutional right to contract freely") (citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972)).  Accordingly, the public interest weighs in favor of awarding the requested injunctive relief.

## IV.    CONCLUSION

For the foregoing reasons, Champion asks the Court to issue a preliminarily injunction which enforces the contractual promises made by Price in his Agreement and enjoins him from disclosing or using Champion's Trade Secrets until a trial can be heard in this matter.

Respectfully submitted,

*s/ Joseph N. Gross*
Joseph N. Gross, Trial Attorney
Bar Number 0056241
Richard E. Hepp
Bar Number 0090448
Alexandria A. Gardella
Bar Number 0100000
**BENESCH, FRIEDLANDER, COPLAN &
    ARONOFF LLP**
200 Public Square, Suite 2300
Cleveland, Ohio 44114-2378
Telephone:  216.363.4500
Facsimile:  216.363.4588
Email:  jgross@beneschlaw.com
            rhepp@beneschlaw.com
            agardella@beneschlaw.com

*Attorneys for Plaintiff Champion Retailco, LLC*

20751716 v1